**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN CRANE INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-CV-05918 |
| | ) | |
| v. | ) | Hon. Amy St. Eve |
| | ) | |
| SIMON GREENSTONE PANATIER | ) | |
| BARTLETT, APC; JEFFREY B. SIMON; | ) | |
| DAVID C. GREENSTONE, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On June 6, 2016, Plaintiff John Crane Inc. ("JCI") brought the present six-count Complaint against Defendants Simon Greenstone Panatier Bartlett, P.C., Jeffrey B. Simon, and David C. Greenstone, collectively, "Defendants," alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and common law claims for conspiracy and fraud. Before the Court is Defendant's motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(3). Defendants contemporaneously filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim, however, as a matter of economy, the Court first addresses Defendants' motion to dismiss for personal jurisdiction and venue. For the following reasons, the Court grants Defendants' motion.

**BACKGROUND**

**I.    The Parties**

Plaintiff John Crane Inc. ("JCI") is a Delaware corporation with its principal place of business in Morton Grove, Illinois that manufacturers and distributes industrial sealing products.

(R. 1, Compl. ¶ 11.)  Defendant Simon Greenstone Panatier Bartlett, PC ("the Firm") is a law firm, organized under the laws of Texas, with its principal place of business in Dallas, Texas. (*Id*. ¶ 12.)  The Firm's partners and shareholders are residents of Texas and California.  (*Id*. ¶ 12.)  Defendants Simon and Greenstone are shareholders and name partners in the Firm.  (*Id*. ¶¶ 13-14.)

Simon and Greenstone ("the Lawyer Defendants") founded the Firm in January 2006. (*Id*. ¶ 24.)  The Firm has offices in California and Texas and primarily represents injured persons in asbestos and mesothelioma personal-injury cases.  (*Id*. ¶¶ 24-25.)  Plaintiff alleges that Simon is lead counsel in the Firm's mesothelioma cases and has final decision-making authority over all Firm litigation, while Greenstone heads the Firm's asbestos bankruptcy practice and serves as the Firm's managing partner.  (*Id*. ¶¶ 27-29.)  Asbestos clients either hire the Firm directly or other lawyers, such as Early, Lucarelli, Sweeny & Meisenkothen ("the Early Firm"), refer clients to the Firm.  (*Id*. ¶ 30.)  Plaintiff alleges that asbestos and mesothelioma cases can be very lucrative for the Firm, often generating multimillion-dollar verdicts.  (*Id*. ¶¶ 32-34.)

## II.      Asbestos Bankruptcy Trusts

Plaintiff alleges that the leading cause of mesothelioma among American workers is exposure to thermal insulation containing amphibole asbestos fibers.  (*Id*. ¶ 35.)  Most companies responsible for producing this "more potent" amphibole-containing insulation have filed for bankruptcy protection due to liability for asbestos personal-injury claims.  (*Id*. ¶ 36.)  Bankruptcy courts have created trusts through which persons exposed to the companies' asbestos-containing products can make claims for compensation.  (*Id*. ¶ 37.)  Unlike tort claims, the parties typically resolve these bankruptcy-trust claims outside the judicial system through procedures established by the advisory committees that oversee the trusts.  (*Id*. ¶ 38.)  Plaintiff alleges that the trusts'

claim procedures typically require a claimant to certify that he or she was exposed to the bankrupt company's asbestos-containing products and trusts only pay claims when a claimant provides credible proof of exposure to a company's products. (*Id*. ¶¶ 39-40.) Asbestos litigation thus exists on a "two-track system" in which lawyers seek money from non-bankrupt companies through tort litigation and seek additional recovery from bankrupt companies through trust claims. (*Id*. ¶ 41.)

Plaintiff alleges that the Firm utilized a fee-sharing agreement with referring lawyers, whereby referring lawyers would often retain their clients' bankruptcy trust claims, the Firm would pursue the tort claims, and then the Firm and the referring lawyers would split the money recovered from both claims. (*Id*. ¶ 42.) Plaintiff contends that the Firm and the referring lawyers exploited the two track system by making claims with the trusts, but withholding in tort litigation the asbestos exposures on which the trust claims were based. (*Id*. ¶ 45.) The trusts' claim procedures made this scheme possible because they included confidentiality provisions preventing disclosure of trust claim information to third parties, sole-benefit provisions requiring that only the trusts use evidence submitted to the trust, and deferral and withdrawal provisions allowing claimants to defer their trust claims until the resolution of other litigation or withdraw their trust claims. (*Id*. ¶ 46.) Plaintiff alleges the Firm or their referring lawyers often filed proofs of claim in bankruptcy cases asserting that their clients had personal injury claims against the bankrupt companies arising from their exposure to the companies' asbestos-containing products. (*Id*. ¶ 48.)

## III.    The Alleged Scheme

Asbestos cases rely heavily on "exposure evidence" indicating that the plaintiff was exposed to an asbestos-containing product and that product caused plaintiff's asbestos-related

disease. (*Id*. ¶ 49.) Plaintiff alleges that Defendants have total control over exposure evidence because their clients' testimony is often the only evidence of exposure. (*Id*. ¶ 51.) Exposure evidence is important because without evidence of exposure to a company's product, a plaintiff cannot recover damages, and unless a plaintiff can show exposure to a non-bankrupt company's product, recovery is limited to the bankruptcy trusts. (*Id*. ¶ 53.) Additionally, evidence of exposure to a bankrupt company's product can provide a defendant in tort litigation with a basis to argue that another company's product partially or fully caused the plaintiff's disease, particularly if the other company's product is more potent. (*Id*.) As a result, alternative exposure evidence, especially when it comes directly from the plaintiff's testimony, makes it substantially more likely that a tort-defendant will be found not liable or that the plaintiff's recovery will be limited. (*Id*. ¶¶ 54-57.) Plaintiff alleges this created an incentive for the Firm to falsify their clients' exposure histories. (*Id*. ¶ 62.)

In addition, Plaintiff alleges that the Lawyer Defendants have admitted that they had a duty to disclose in tort litigation alternative exposures related to bankrupt companies. (*Id*. ¶¶ 63, 68.) Plaintiff alleges that the Firm coordinates with referring lawyers in drafting responses in tort litigation to ensure that its clients' positions are consistent with clients' trust claims. (*Id*. ¶¶ 66-67.) The Firm typically shared discovery created during tort litigation with the referring firms, such as the Early firm, and the Firm's lawyers sometimes conducted the investigation of a client's claims for both litigation and trust claims. (*Id*. ¶¶ 70-71.)

Plaintiff alleges that the Firm generally delayed filing trust claims until after the resolution of the tort litigation, especially if the Firm handled the trust claims as well as the tort litigation. (*Id*. ¶ 74.) Plaintiff further alleges that Defendants investigated their clients' exposure histories early in the litigation process, but delayed filing trust claims so the tort defendants

would not know about the trust claims, often filing trust claims weeks after the tort litigation concluded.  (*Id*. ¶¶ 76-79.)  According to Plaintiff, Defendants intended the process of delaying the filing of trust claims to create the false appearance that the plaintiffs had only been exposed to asbestos-containing products made by non-bankrupt companies, even though Defendants knew the plaintiffs had been exposed to more potent products associated with bankrupt companies.  (*Id*. ¶¶ 80-81.)

Furthermore, Plaintiff alleges that Defendants' practice of delaying the filing of trust claims until the resolution of the tort litigation resulted in Defendants deliberately hiding the existence of alternative exposure in litigation.  (*Id*. ¶ 82.)  Plaintiff alleges Defendants "systematically provided false" responses in discovery in tort litigation, typically falsely denying the plaintiffs' exposure to any asbestos-containing products other than the products at issue in the tort litigation.  (*Id*. ¶¶ 84-85.)  Defendants also caused their clients to not testify concerning alternative exposures or identify exposures only to products of non-bankrupt companies in their depositions.  (*Id*. ¶¶ 88-89.)  According to Plaintiff, it could not have known of the falsity of the Firm's clients' exposure histories because only the Firm was aware of the clients' true exposure histories.  (*Id*. ¶ 91.)  Plaintiff only discovered the false exposure histories prepared by Defendants when discovery in a related bankruptcy proceeding was unsealed in May 2015.  (*Id*. ¶ 93.)

Plaintiff alleges that Defendants' ultimate goal was to use fabricated exposure histories to fraudulently obtain money verdicts and settlements in tort litigation.  (*Id*. ¶ 95.)  Defendants created the false appearance that their clients had no alternative exposure history and ensured that there was no direct evidence of alternative exposure, allowing them to argue that any diseases were caused by the non-bankrupt company involved in tort litigation.  (*Id*. ¶¶ 96-97.)

Plaintiff alleges that Defendants not only fabricated exposure histories, but then filed motions in limine attempting to exclude evidence of alternative exposure as unsubstantiated, even though they were aware that their clients had been exposed to alternative asbestos-containing products. (*Id*. ¶¶ 97-99.)  Through these motions in limine, Defendants deprived Plaintiff of the opportunity to present legitimate evidence of alternative exposure.  (*Id*. ¶ 101.)  Plaintiff alleges that through this scheme, Defendants increased their likelihood of success at trial and the likelihood that they would receive a more substantial judgment or settlement by intentionally misleading opposing counsel, judges, and juries.  (*Id*. ¶¶ 103-06.)  In contrast, in cases where Plaintiff was able to bring evidence of alternative exposure, Plaintiff often won defense verdicts or was found to have a relatively low percentage of fault, resulting in lower payments to Defendants' clients.  (*Id*. ¶ 107.)

## IV.    Alleged Specific Examples of Racketeering Conduct

### A.  The *Kelemen* Case

Plaintiff alleges that on January 24, 2008, Defendants filed an asbestos-mesothelioma complaint against Plaintiff and several other non-bankrupt companies in Los Angeles County Superior Court.  (*Id*. ¶¶ 111-12.)  Simon took the deposition of one of the other non-bankrupt company's employees.  (*Id*. ¶ 114.)  Plaintiff alleges that the Firm, or someone acting at the direction of the Firm, took a deposition of Plaintiff's employee in Chicago.  (*Id*. ¶ 115.)  Defendants won a jury verdict in October 2009 for $30 million with Plaintiff found to be 70% at fault, and Plaintiff settled the case in December 2011.  (*Id*. ¶¶ 116-17.)  In January 2012, Defendants negotiated with Plaintiff's lawyers, located in Illinois, regarding the settlement terms, and ultimately, Plaintiff paid the settlement amount to Defendants using interstate wires.  (*Id*. ¶¶ 118-19.)  Plaintiff contends that, in litigation, Defendants represented that no bankruptcy trust

claims had been filed and that their clients had no alternative exposure, however, Defendants' clients had filed 12 bankruptcy trust claims, four of which they filed before the jury rendered a verdict in the tort litigation. (*Id.* ¶¶ 120-21.) Defendants also provided false information in discovery transmitted through interstate wires, including interrogatory responses that stated that their client had never worked with another company's asbestos product and work histories that showed exposure only to non-bankrupt companies' products. (*Id.* ¶¶ 124-26.) Defendants knowingly filed these false discovery responses and purposefully did not supplement those responses, even though their clients were pursuing bankruptcy trust claims that directly contradicted the assertions in their responses. (*Id.* ¶¶ 127-28, 141.)

Plaintiff claims that Defendants directed their client to testify at his May 2008 deposition exclusively about products associated with non-bankrupt companies and to state that he had not worked with certain products, despite the fact that Defendants, or those acting under their supervision, were pursuing bankruptcy trust claims based on proof of their client's exposure to those products. (*Id.* ¶¶ 136-38.) Before trial, Defendants moved to exclude alternative exposures and made false representations at trial that their client had not been exposed to products from non-bankrupt companies even though their client had already filed four bankruptcy trust claims. (*Id.* ¶¶ 147-50.) Plaintiff alleges that these misrepresentations caused Plaintiff to alter its defense strategy, increase its defense costs, and ultimately suffer an adverse verdict. (*Id.* ¶¶ 152.) Plaintiff alleges that Defendants continued to misrepresent their client's exposure history in post-trial filings and appellate litigation, all while their client continued to file new bankruptcy trust claims. (*Id.* ¶¶ 153-55.)

## B. The *Geist* Case

On March 3, 2010, Defendants filed an asbestos-mesothelioma complaint against Plaintiff and several other companies, only one of which was bankrupt, in Los Angeles County Superior Court. (*Id*. ¶¶ 159-60.) The Lawyer Defendants, or those acting under their supervision, took the deposition of Plaintiff's employee in Chicago. (*Id*. ¶ 162.) In October 2010, the court entered a verdict in favor of Geist, and Defendants settled the case on appeal. (*Id*. ¶ 163.) Plaintiff alleges that Defendants' discovery responses did not disclose alternative exposure, even though Geist had filed bankruptcy trust claims asserting exposure to other products containing "more potent asbestos." (*Id*. ¶¶ 164-65.) As in the *Kelemen* case, Defendants filed false interrogatory responses indicating that their client had no alternative exposure history all while pursuing bankruptcy claims based on alternative exposures. (*Id*. ¶¶ 166-70.) Geist similarly denied alternative exposure in his deposition, where Firm lawyers represented him. (*Id*. ¶¶ 170-72.) Firm lawyers handled both Geist's bankruptcy claims and the tort litigation in which he denied alternative exposure. (*Id*. ¶¶ 174-76.) Plaintiff alleges that Defendants knowingly, or with reckless disregard for the truth, concealed the existence of their client's alternative exposure history from Plaintiff and the court, causing Plaintiff to expend unnecessary sums at trial and to suffer an adverse verdict. (*Id*. ¶¶ 178-86.)

## C. The *Lange* Case

On August 22, 2008, Defendants filed an asbestos-mesothelioma complaint against Plaintiff and several other non-bankrupt companies in Los Angeles County Superior Court. (*Id*. ¶¶ 187-88.) Defendants dismissed Plaintiff from the case in January 2010 in exchange for waiver of costs, but only after Plaintiff had expended substantial defense costs. (*Id*. ¶ 191.) Plaintiff alleges that Defendants provided false information in discovery transmitted through

interstate wires, including interrogatory responses that misrepresented their client's exposure history and directly contradicted their client's bankruptcy claim filings. (*Id*. ¶¶ 192-95.) Additionally, in Lange's deposition, he claimed that he could not remember being exposed to a certain brand of boiler, despite the fact that Lawyer Defendants later filed bankruptcy trust claims based on exposure to that particular brand of boiler. (*Id*. ¶¶ 197-98.) After the termination of the tort litigation, Defendants filed several bankruptcy claims that relied on exposure histories that contradicted Defendants' representations in the tort litigation. (*Id*. ¶¶ 199-202.)

### D.  The *White* Case

On May 17, 2006, Defendants filed an asbestos-mesothelioma complaint against Plaintiff and several other non-bankrupt companies in state court in Texas. (*Id*. ¶¶ 203-04.) The Lawyer Defendants were lead counsel and Simon took his client's deposition personally as well as the deposition of Plaintiff's employee in Chicago. (*Id*. ¶¶ 206-07.) Defendants dismissed Plaintiff from the case in April 2007 in exchange for waiver of costs, but only after Plaintiff had expended substantial defense costs. (*Id*. ¶ 208.) Plaintiff alleges that Defendants provided false information in discovery transmitted through interstate wires, including interrogatory responses that misrepresented their client's exposure history and responses that failed to include exposures for which White later brought bankruptcy claims. (*Id*. ¶¶ 210-14.) Shortly after Defendants dismissed the case, they or the Early firm filed bankruptcy trust claims for White, and these claims included exposure histories that Defendants had failed to disclose in the tort litigation. (*Id*. ¶¶ 221-25.)

### E. The *Hill* Case

On July 20, 2012, Defendants filed an asbestos-mesothelioma complaint against Plaintiff and several other non-bankrupt companies in state court in Los Angeles. (*Id*. ¶¶ 227-28.) The case was later removed to federal court in October 2012. (*Id*. ¶ 229.) Defendants represented Hill at his deposition in January 2013, where he denied being exposed to products other than Plaintiff's, although weeks later, in February 2013, he signed an affidavit in relation to a bankruptcy claim indicating that he had been exposed to other asbestos-containing products. (*Id*. ¶¶ 231-34.) Plaintiff alleges that Defendants procured this affidavit and concealed it from Plaintiff and the court in the federal tort litigation for over a year, until they finally produced the affidavit and five others in January 2014. (*Id*. ¶¶ 235-39.) Plaintiff won a defense verdict at trial in November 2014, which Plaintiff alleges confirms that when Defendants provided truthful information to Plaintiff in litigation, Plaintiff achieved materially better results than in cases where Defendants provided false information. (*Id*. ¶¶ 240-42.) Plaintiff also contends that Defendants concealed their client's exposure history from their own expert, which could have resulted in an inaccurate expert report had they not been forced to update their expert when they produced the affidavit relating to the bankruptcy claims. (*Id*. ¶¶ 243-47.)

### F. The *Heckelsberg* Case

On June 21, 2010, Defendants filed an asbestos-mesothelioma complaint against Plaintiff in state court in Philadelphia. (*Id*. ¶¶ 250, 52.) Defendants served the complaint on Plaintiff's registered agent in Pennsylvania, and the agent transmitted the complaint through interstate wires to Plaintiff in Illinois. (*Id*. ¶ 251.) The *Heckelsberg* trial was bifurcated into liability and damages phases, and the liability phase was tried to a court while the damages phase was tried to a jury. (*Id*. ¶ 254.) At trial, Defendants played two video depositions of Plaintiff's employees,

both of which were taken in Chicago. (*Id*. ¶ 256.) In July 2011, the jury found for Defendant's client in the amount of $1.24 million, and Plaintiff paid its share of these damages in August 2011 via a check transported from Plaintiff's office in Illinois to Defendants' offices via interstate mail. Plaintiff alleges that Defendants provided false information in discovery transmitted through interstate wires, including interrogatory responses that misrepresented their client's exposure history and responses that failed to include exposures for which their client later brought bankruptcy claims. (*Id*. ¶¶ 261-65.)

### G. The *Leroy Eisler* Case

On March 9, 2010, Defendants filed an asbestos-mesothelioma complaint against Plaintiff and other non-bankrupt companies in Los Angeles County Superior Court. (*Id*. ¶¶ 268, 270.) On April 8, 2010, Eisler reached a settlement agreement with Garlock, another company that produced asbestos-containing products, in which Eisler repeated allegations that he had been exposed to asbestos from Garlock's products. (*Id*. ¶ 272.) On the same day, Firm attorneys prepared or signed their client's discovery responses in Plaintiff's tort litigation, and the work history sheet provided to Plaintiff falsely omitted any mention of exposure to Garlock products. (*Id*. ¶¶ 273-76.) In his July 2010 deposition, where he was represented by Firm attorneys, Eisler denied that he was exposed to Garlock products despite the Lawyer Defendants having already executed a settlement with Garlock based on his exposure to their products. (*Id*. ¶¶ 279-80.) Defendants ultimately dismissed Plaintiff from Eisler's tort case in exchange for waiver costs. (*Id*. ¶ 281.) After the conclusion of the tort case, Defendants filed several bankruptcy trust claims on Eisler's behalf that included proof of asbestos exposure that Defendants failed to provide in discovery in the tort litigation. (*Id*. ¶¶ 282-85.)

## V.    Conclusion

In sum, Plaintiff alleges that Defendants' material omissions and false representations regarding their clients' alternative exposures to asbestos caused Plaintiff to be unable to present meritorious arguments or defenses and resulted in financial damage to Plaintiff.  (*Id*. ¶¶ 288-91.) Plaintiff alleges that Defendants knew or recklessly disregarded the falsity of their representations and omissions and intended to deceive and defraud Plaintiff.  (*Id*. ¶¶ 292-94.) Plaintiff alleges that this scheme was "nationwide in scope."  (*Id*. ¶ 301.)  In addition, Plaintiff alleges that although the Firm has offices in Texas and California, they practice throughout the country, including in Illinois, and the exemplar cases are from Texas, California, and Pennsylvania.  (*Id*.)  According to Plaintiff, Defendants relied on interstate mail and wires to serve court documents, send pleadings and discovery response, file motions with the court, and communicate settlement demands with Plaintiff and its counsel, both located in Chicago.  (*Id*. ¶¶ 302-03.)  Defendants also caused Plaintiff to make payments to Defendants' clients via interstate mail and wires.  (*Id*. ¶ 306.)  Plaintiff alleges that the fraudulent scheme was Defendants' regular course of business and that Defendants utilized the scheme in all cases that they brought against Plaintiff, including cases filed against Plaintiff in the Northern District of Illinois.  (*Id*. ¶ 309.)

## LEGAL STANDARD

## I.    Rule 12(b)(2)

A motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) tests whether a federal court has personal jurisdiction over a defendant.  *See* Fed. R. Civ. P. 12(b)(2); *Central States v. Phencorp. Reins. Co.*, 440 F.3d 870, 875 (7th Cir. 2006).  In analyzing a Rule 12(b)(2) motion, courts may consider matters outside of the pleadings.  *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).  Once the defendant

"moves to dismiss to dismiss the complaint . . . for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Id.* Without the benefit of an evidentiary hearing, the plaintiff "bears only the burden of making a prima facie case for personal jurisdiction." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423-24 (7th Cir. 2010). Under such circumstances, courts take "the plaintiff's asserted facts as true and resolve any factual disputes in its favor." *Id.* Where the plaintiff fails to refute facts contained in the defendant's affidavit, however, courts accept those facts in the affidavit as true. *GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009).

## II. Rule 12(b)(3)

In deciding a motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3), all allegations are taken as true, unless contradicted by the defendant's affidavits and the court may consider facts outside the pleadings. *See Faulkenberg v. CB Tax Franchise Sys., LP,* 637 F.3d 801, 806 (7th Cir. 2011). Courts must resolve any conflicts in the affidavits regarding relevant facts in the plaintiff's favor. *See Purdue Research Found. v. Sanofi–Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003). The Seventh Circuit has cautioned that "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783; *see also Faulkenberg,* 637 F.3d at 806 (noting that the same standards apply to improper venue as do a Rule 12(b)(2) dismissal). When a defendant challenges venue, the plaintiff bears the burden of establishing proper venue. *Nat'l Tech. Inc. v. Repcentric Solutions,* No. 13 C 1819, 2013 WL 3755052, at *5 (N.D. Ill. June 16, 2013) (citing *Int'l Travelers Cheque Co. v. BankAmerica Corp.,* 660 F.2d 215, 222 (7th Cir. 1981)). If venue is improper, the court may either dismiss the suit or transfer it to a district in

which the plaintiff could have filed it initially.  *See* 28 U.S.C. § 1406(a).  Venue can be proper in

more than one district.  *See Armstrong v. LaSalle Bank Nat'l Ass'n,* 552 F.3d 613, 617 (7th Cir.

2009).

## ANALYSIS

### I.     Personal Jurisdiction

#### A.  Applicable Legal Principles

"The plaintiff bears the burden of establishing personal jurisdiction when the defendant

challenges it."  *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014).  Where, as

here, the federal statute in question does not provide "a special federal rule for personal

jurisdiction," the law of the forum state provides the governing rule.[1]  *Advanced Tactical*

*Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014); *see also N.*

*Grain Mktg.*, 743 F.3d at 491; *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).  A "court's

exercise of jurisdiction over the defendant must be authorized by the terms of the forum state's

long arm statute and also must comport with the requirements of the Fourteenth Amendment's

Due Process Clause."  *Felland*, 682 F.3d at 672 (citing *Tamburo v. Dworkin*, 601 F.3d 693, 700

(7th Cir. 2010)); *see also N. Grain Mktg.*, 743 F.3d at 491-92.

---

[1] RICO, the federal statute at issue in this case, does include a nationwide-service-of-process provision, but it applies only if one defendant "resides, is found, has an agent or transacts his affairs" in the district in which the suit is brought and the "ends of just require" that the other defendants be brought before the same court.  18 U.S.C. § 1965(a)-(b).  Plaintiff, citing no case law, mentions the RICO jurisdiction provision in one sentence in a footnote, and accordingly, Plaintiff has waived the argument that jurisdiction is proper under the RICO statute.  *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013); *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties," and "perfunctory and undeveloped arguments" are waived.); *Sadighi v. Daghighfekr*, 36 F. Supp. 2d 267, 273 (D.S.C. 1999) (Under § 1965(b), "nationwide service of process is not automatic; instead, a plaintiff has to demonstrate that the ends of justice require the assertion of such process.").

"Illinois law permits its courts to exercise jurisdiction over a person 'as to any cause of action arising from . . . (1) [t]he transaction of any business within Illinois[.]'" *N. Grain Mktg.*, 743 F.3d at 491 (quoting 735 ILCS 5/2-209(a)(1)). The Illinois long-arm statute also contains a catch-all provision, permitting a court to exercise personal jurisdiction "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c). "Thus, the [Illinois] statutory question merges with the constitutional one." *N. Grain Mktg.*, 743 F.3d at 492. Because the Seventh Circuit has recognized that "there is no operative difference between these two constitutional limits," the key question is "whether the exercise of personal jurisdiction would violate federal due process." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010) (citations omitted); *see also Russell v. SNFA*, 2013 IL 113909, ¶¶ 32-33, 987 N.E. 2d 778, 785-86 (Ill. 2013) ("there have been no decisions . . . identifying any substantive difference between Illinois due process and federal due process on the issue of a court's exercising personal jurisdiction over a nonresident defendant").

The due process clause permits the exercise of personal jurisdiction over a nonresident defendant as long as the defendant purposefully has established "minimum contacts" with the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). The "minimum contacts" standard may be satisfied by personal jurisdiction that is either general or specific. *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014). The Court addresses each type of personal jurisdiction in turn.

### B. General Jurisdiction

In their Motion to Dismiss, Defendants explicitly argued that the Court does not have general jurisdiction over Defendants. (R. 25, Defs.' Mot. to Dismiss, 7-8.) Plaintiff failed to

respond to Defendants' general jurisdiction argument and instead, in a footnote, asked the Court for permission to conduct jurisdictional discovery if the Court ruled against Plaintiff on the question of specific jurisdiction.[2] As a result, Plaintiff has not only failed to meet its burden regarding general jurisdiction, it has also waived any argument that this Court has general jurisdiction over Defendants. *Holm*, 326 F.3d at 877 ("It is not the obligation of this court to research and construct the legal arguments open to parties," and "perfunctory and undeveloped arguments" are waived.); *Rose v. United States,* 929 F. Supp. 305, 309 (N.D. Ill. 1996) (stating that "the paucity of argument on this issue in her response brief essentially waives the claim") (*citing Bakalis v. Golembeski,* 35 F.3d 318, 326 n. 8 (7th Cir. 1994)); *see also Foppa v. Specialized Bicycle Components, Inc.*, No. 1:14-CV-1407-CAP, 2015 WL 11256937, at *2 (N.D. Ga. Mar. 11, 2015) (dismissing for lack of personal jurisdiction because plaintiff's response "fail[ed] to mention . . . any evidence supporting jurisdiction"); *Kruska v. Perverted Justice Found. Inc.*, No. CV 08-0054-PHX-SMM, 2008 WL 5101919, at *1 (D. Ariz. Nov. 28, 2008) (plaintiff did not establish personal jurisdiction because she "fail[ed] to address [d]efendant's jurisdictional arguments").

Even if Plaintiff had not failed to make a general jurisdiction argument, the Court still could not exercise general jurisdiction over Defendants. "To establish the minimum contacts necessary to establish general personal jurisdiction, plaintiffs bear a high[ ] burden." *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1330 (Fed. Cir. 2008). "General jurisdiction exists when a foreign corporation's continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Daimler*, 134 S. Ct. at 749 (citations and

---

[2] As discussed below, Plaintiff is not entitled to jurisdictional discovery.

quotations omitted). The Supreme Court has identified two "paradigm all-purpose forums for general jurisdiction" for a corporation: the state of the corporation's principal place of business or the state of its incorporation. *Id*. at 760. Absent these circumstances, a "court may assert general jurisdiction over foreign . . . corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* at 754 (citations and quotations omitted). The inquiry "is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id*. at 761. In fact, the Supreme Court has made clear, that to "approve the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business . . . is unacceptably grasping." *Id*. at 757 (citations and quotations omitted). General jurisdiction thus "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide." *Id*. at 762 n. 20. "A corporation that operates in many places can scarcely be deemed at home in all of them." *Id*.

Here, as noted above, Plaintiff does not ask the Court to find that it has general jurisdiction over Defendants. Indeed, Plaintiff's allegations do not meet the high burden required for this Court to exercise general jurisdiction. (R. 34, Pl.'s Opp'n to Defs.' Mot. to Dismiss, 19 n. 3.) Based on the record, Illinois is not Defendants' "paradigm all-purpose forum" because the Defendant Firm has a principal place of business in Texas and is incorporated in Texas. *Daimler*, 134 S. Ct. at 760. Further, Defendants' contacts with Illinois are not "so continuous and systematic as to render [it] essentially at home" in Illinois. *Id*. at 761. Plaintiff does not dispute that Defendants do not maintain offices in Illinois, none of its lawyers reside or

are licensed to practice in Illinois, it maintains no records in Illinois, and that the Firm owns no property in Illinois. While Defendants do occasionally engage in litigation in Illinois or litigate against corporations based in Illinois, these contacts are not sufficient to confer general jurisdiction on Defendants in Illinois, especially since, as Defendants note, the Firm has only filed 4% of its total cases in Illinois. (R. 39, Defs.' Reply in Supp. of Mot. to Dismiss, 4); *see also Meyer v. Hanft Fride*, No. 11 C 4126, 2012 WL 1050296, at *2 (N.D. Ill. Mar. 28, 2012) (finding that New Jersey law firm was not subject to general jurisdiction in Illinois because firm did not have Illinois offices or residents and firm's litigation activity in Illinois was only a small part of its practice). Simply put, just because Defendants occasionally do business in Illinois, does not mean they are "at home" in Illinois. Accordingly, Defendants are not subject to general jurisdiction in Illinois.

### C. **Specific Jurisdiction**

"Unlike general personal jurisdiction, a court's exercise of specific jurisdiction requires that the defendant's contacts with the forum state relate to the challenged conduct." *Felland*, 682 F.3d at 673. Three requirements exist to establish specific jurisdiction: "(1) the defendant must have purposely availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland*, 682 F.3d at 673 (citations omitted). The Supreme Court has cautioned, that not just any contacts with the forum state will suffice: "[f]or a State to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State." *Walden*, 134 S. Ct. at 1121 (emphasis added). Moreover, contacts with the forum that are "random", "fortuitous," or

"attenuated," or that result from the "unilateral activity of another party or third person" are not sufficient to establish personal jurisdiction. *Burger King*, 471 U.S. at 475. Lastly, the relationship between the defendant and the forum "must arise out of contacts that the defendant *himself* creates with the forum. . ." *Walden*, 134 S. Ct. at 1122 (citations and quotations omitted).

With this background, the Court turns to the parties' arguments. Defendants argue that this Court does not have personal jurisdiction over them because Plaintiff's claims against Defendants relate entirely to Defendants' alleged conduct in cases litigated outside of Illinois, namely in California, Texas, and Pennsylvania. Defendants argue that the Seventh Circuit has resolved that an Illinois court cannot exercise personal jurisdiction over a defendant law firm in relation to out-of-state litigation, even if the law firm interacts with parties in the forum state in the course of that litigation, because contacts with a forum state that are incidental to litigation in another state are insufficient to create personal jurisdiction. *See Wallace v. Heron*, 778 F.2d 391, 393-95 (7th Cir. 1985).

In response, Plaintiff argues Defendants "expressly aimed" their activities at Illinois by directing communications that they knew contained misrepresentations to Plaintiff in Illinois and caused injury to Plaintiff in Illinois. Plaintiff asserts that *Wallace* is distinguishable because in that case, the attorney defendant had contacts with the forum state in relation to a single lawsuit and his allegedly tortious conduct in that state was limited, whereas here, Plaintiff alleges Defendants engaged in broader and more consistent misconduct in Illinois related to a series of lawsuits. Finally, Plaintiff argues that personal jurisdiction on Defendants here is fundamentally fair because Defendants are a national law firm that frequently litigates cases and represents clients in Illinois.

Given the parties' focus on the "purposeful direction" prong, the Court turns to this issue first. Where, as here, the plaintiff alleges an intentional tort, the purposeful-direction inquiry "focuses on whether the conduct underlying the claims was purposely directed at the forum state." *Tamburo v. Dworkin,* 601 F.3d 693, 702 (7th Cir. 2010). In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court laid out three requirements for determining whether conduct was purposefully directed at the forum state: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Felland*, 682 F.3d at 674–75 (quoting *Tamburo,* 601 F.3d at 703) (discussing *Calder* factors). "If the plaintiff makes these three showings, he has established that the defendant 'purposefully directed' his activity at the forum state." *Id.* at 675. "The cases that have found express aiming have all relied on evidence beyond the plaintiff's mere residence in the forum state." *Mobile Anesthesiologists*, 623 F.3d at 447. In other words, the Seventh Circuit has found personal jurisdiction only where there is both a "forum-state injury" and "something more" reflecting "tortious conduct specifically directed at the forum." *Tamburo,* 601 F.3d 706; *compare Coté v. Wadel,* 796 F.2d 981, 984 (7th Cir. 1986) ("The only significant connection between the suit and Wisconsin is that the plaintiff lives there; and you cannot get jurisdiction over a nonresident just by showing that you are a resident and would prefer to sue in your own state's courts.")

Here, Plaintiff has met the first and third requirements for the purposeful direction test. As alleged in the complaint, Defendants intentionally directed false discovery responses and other communications to Plaintiff and its counsel in Illinois, which suffices to establish "intentional and allegedly tortious conduct." Likewise, Defendants certainly knew the alleged harm would be felt in Illinois because Defendants were aware that Plaintiff resides in Illinois.

The main point of dispute thus concerns the second requirement—whether Defendants' conduct was "expressly aimed" at Illinois.

Plaintiff argues that Defendants have created sufficient minimum contacts with Illinois by directing false communications to Plaintiff in Illinois and accepting payments from Plaintiff in Illinois as part of their allegedly fraudulent scheme. In support of this argument, Plaintiff cites to cases in which courts have exercised personal jurisdiction over out-of-state defendants who allegedly engaged in fraudulent RICO schemes that involved directing false mailings or communications at plaintiffs in Illinois. Plaintiff cites *Master Tech Prod., Inc. v. Smith*, 181 F. Supp. 2d 910 (N.D. Ill. 2002), in which an Illinois company sued a Texas company for fraudulently extracting confidential information under the guise of negotiations to acquire the Illinois company. The court found that it could exercise personal jurisdiction over the Texas company because the company's employees placed telephone calls to the Illinois company in furtherance of the fraudulent scheme. *Id*. at 912. Plaintiff also cites to *FMC Corp. v. Varonos*, 892 F.2d 1308 (7th Cir. 1990), in which an Illinois company brought a RICO suit against a Greek citizen alleging that the citizen faxed fraudulent invoices and requests for monies to the Illinois company. The court held that personal jurisdiction was appropriate because the defendant sent fraudulent communications to Illinois to "effectuate her scheme to defraud" the Illinois company and thus "should have foreseen that she could be required to answer for her actions in Illinois. *Id*. at 1313.

The Court, however, finds the Seventh Circuit precedent in *Wallace* more compelling than the cases cited by Plaintiff. In *Wallace*, the plaintiff, an Indiana resident, sued the defendants, three California attorneys, in Indiana for malicious prosecution based on a prior lawsuit the defendants litigated against the plaintiff in California. *Wallace v. Herron*, 778 F.2d

391, 392 (7th Cir. 1985).  The plaintiff argued that an Indiana district court could properly exercise personal jurisdiction because the defendant lawyers "served interrogatories, requested production of documents, and caused the plaintiff to respond to five complaints in Indiana where the plaintiff reside[d]." *Id*. at 394.  The Seventh Circuit held that the defendants lacked the necessary minimum contacts with Indiana because all the allegedly malicious litigation actions the defendants directed at Indiana were done "on behalf of their clients in a California court pursuant to a California lawsuit." *Id*.  The court explained that "it would be unreasonable to require the defendants to appear in Indiana to defend this suit on the basis of such attenuated contacts." *Id*.  The court distinguished the case from *Calder*, explaining that in *Calder*, California was the focal point of the entire dispute because the suit grew out of an article the defendant wrote about a California resident, based on California sources, with a reputational harm felt in California. *Id*. at 395.  In contrast, the court reasoned that in the case before it, the only "arguable contacts with Indiana were the legal papers" served in Indiana on behalf of California clients in relation to a California lawsuit.  *Id*.

Other courts, in several jurisdictions, have similarly refused to exercise specific jurisdiction over attorneys for their forum state contacts related to out-of-state litigation, even when the attorneys were representing clients residing in the forum state.  In *Coté*, 796 F.2d at 983–84, for example, the plaintiff, a Wisconsin resident, hired the defendant, a Michigan lawyer, to represent her in a lawsuit in Michigan state court and the lawyer failed to prosecute her suit. *Id*.  The Seventh Circuit held that personal jurisdiction did not exist in Wisconsin, even though the lawyer directed calls and letters to his client in Wisconsin, because the actions at issue in her suit—the defendant's failure to prosecute her initial lawsuit—all occurred in Michigan.  The court explained that the "only significant connection between the suit and Wisconsin is that the

plaintiff lives there" and the "letters and phone calls that passed between" the defendant and the plaintiff were "not enough to close the gap." *Id.*

Similarly, in *Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*, 269 F. Supp. 2d 547, 554–55 (D.N.J. 2003), a manufacturer brought an action against a consulting firm, and the firm filed a complaint against the manufacturer's attorney in relation to the attorney's representation of the manufacturer in a North Carolina arbitration between the manufacturer and the consulting firm. The consulting firm alleged that the attorney acted "recklessly and negligently" by allowing his New Jersey client's witness to submit documents to and testify in front of the arbitration panel without verifying the reliability of the documents or testimony. *Id.* Before the arbitration hearing, the attorney exchanged letters with the New Jersey witness in which the attorney described the key issues and asked the witness to provide videos and photographs. *Id.* The court found that the attorney's "contacts with New Jersey did not provide a basis for exercising specific personal jurisdiction over him" because while the letters to New Jersey dealt generally with the arbitration, they were only tangential to the specific tortious conduct alleged by the consulting firm, all of which occurred at the arbitration in North Carolina. *Id. See also Mayes v. Leipziger,* 674 F.2d 178, 184–85 (2d Cir. 1982) (no purposeful activity to justify jurisdiction in New York over California law firm solicited by New York client for representation in California when contacts consisted of communications to New York by mail and telephone); *Sher v. Johnson,* 911 F.2d 1357, 1362, 366 (9th Cir. 1990) ( "[o]ut-of-state legal representation does not establish purposeful availment of the privilege of conducting activities in the forum state, where the law firm is solicited in its home state and takes no affirmative action to promote business within the forum state.").

The Court finds *Wallace*,[3] as well as the other cases discussed above, more persuasive than the cases cited by Plaintiff because *Wallace*, unlike the cases cited by Plaintiff, directly addresses whether Illinois contacts related to litigation in other states for clients in other states can create personal jurisdiction in Illinois. Plaintiff, unable to cite any cases in this circuit that found litigation-related contacts sufficient to justify the exercise of personal jurisdiction,[4] attempts to distinguish *Wallace*, arguing that it is different than this case because the defendant's conduct was more limited and related to only one case, whereas here, there were multiple underlying lawsuits. Plaintiff also notes that in Wallace "the bulk of the alleged wrongful prosecution took place in another state."

Like in *Wallace*, however, Plaintiff here has sued an out-of-state law firm for an intentional tort—there, malicious prosecution, here, a RICO fraud scheme—that centered on out-of-state litigation. Although the defendants in both *Wallace* and this case directed litigation related documents that furthered the alleged intentional torts at plaintiffs in the forum state, the focal point of the intentional tort remained in the state where the underlying litigation was based. Thus, like in *Wallace*, here, the only suit-related contacts with Illinois were "legal papers served" in Illinois, but, to use Plaintiff's words, "the bulk of the alleged" tort occurred in the California, Texas, and Pennsylvania courts where Defendants were litigating their asbestos claims against Plaintiff. It is in those states, not Illinois, that Defendants took depositions of their clients, tried cases against Plaintiff, and won verdicts against it. Unlike *FMC Corp.* and *Master Tech*, where

---

[3] The Court's reliance on *Wallace* is bolstered by the Seventh Circuit's recent endorsement of *Wallace's* more narrow interpretation of *Calder's* purposely directed test. *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 445 (7th Cir. 2010) ("We view *Wallace* as a correct statement of the standard set down by the Supreme Court.")

[4] Plaintiff cites to one Fifth Circuit case, *Wein Air Alaska, Inc. v. Brandt*, 195 F. 3d 208 (5th Cir. 1999), for the proposition that a court may exercise personal jurisdiction based on an attorney defendants' litigation-related contacts. (R. 34, Pl.'s Opp'n to Defs.' Mot. to Dismiss at 15.)

the defendants expressly aimed fraudulent communications that were at the heart of a fraudulent scheme, here, like in *Wallace*, any discovery responses Defendants filed in Illinois were done "on behalf of their clients in a [out-of-state] court pursuant to a [out-of-state] lawsuit." *Id*. at 394. Those discovery responses were incidental to the claims and lawsuits that were centered entirely in other states, and "they are not indicative of any desire to do business in [Illinois] and do not suffice to show purposeful availment or minimum contacts." *Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.,* 638 F. Supp. 2d 1, 9 (D.D.C. 2009) (dismissing case for lack of jurisdiction in client's home forum over Dutch law firm accused of breach of fiduciary duty in suit related to legal work performed in Netherlands).

Ultimately, as in *Wallace*, the intentional tort alleged here was not focused in Illinois, it was focused in out-of-state courts in California, Texas, and Pennsylvania. "Forum-state injury" is not enough. *Tamburo,* 601 F.3d 706. "Bad financial consequences to a firm in Illinois . . . are not the same as a tortious *injury* occurring to the firm in Illinois." *Macey & Aleman v. Simmons*, No. 10-C-6646, 2012 WL 527526, at *4 (N.D. Ill. Feb. 15, 2012). Here, while Plaintiff suffered financial consequences in Illinois, the tortious injury Plaintiff alleges occurred in the states where Defendants were litigating asbestos claims against Plaintiff, not in Illinois. For purposes of specific jurisdiction, Defendants' contacts with Illinois in other litigation are irrelevant, only Defendants' contacts related to this suit matter. *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) ("defendant's suit-related conduct must create a substantial connection with the forum [s]tate"). As the analogous case law demonstrates, contacts that are incidental to litigation at the heart of a plaintiff's claim—whether it is calls and letters as in *Wartsila*, arbitration preparation as in *Coté*, or discovery responses as in *Wallace* and here—are not sufficient to show that a defendant attorney "expressly aimed" his conduct at that state or purposefully availed himself of the

privilege of doing activities there.  Here, like in *Wallace*, Defendants' alleged "tortious conduct [was] specifically directed" not at Illinois, but at the states were they filed lawsuits and litigated those suits to harm Plaintiff.

Plaintiff has thus failed to establish that Defendants expressly aimed their conduct at Illinois, so it has failed to establish that the Court has personal jurisdiction over Defendants.[5] Defendants' motion to dismiss is accordingly granted.

### D.  Jurisdictional Discovery

Plaintiff also requests in one sentence in a footnote that, if the Court finds that it does not have specific jurisdiction over Defendants, it should grant jurisdictional discovery to discern the full scope of Defendants' personal jurisdiction contacts with Illinois.  (R. 34, Pl.'s Opp'n to Defs.' Mot. to Dismiss, 19 n. 3.)  Plaintiff cites no case law and provides no factual support for its request for jurisdictional discovery.  Cursory arguments raised in footnotes are deemed waived.  *See Harmon*, 712 F.3d at 1053; *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009); *Price v. City of Chicago*, No. 16-CV-8268, 2017 WL 36444, at *8 (N.D. Ill. Jan. 4, 2017).  Accordingly, Plaintiff has waived the argument that jurisdictional discovery is warranted.

Even if Plaintiff had not waived that argument, Plaintiff's allegations and briefing demonstrate that jurisdictional discovery is not necessary here.  The Seventh Circuit has held that, "[a]t a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted."  *Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 946 (7th Cir. 2000).  When

---

[5] Because the Court finds that the first prong of the specific jurisdiction analysis is not met here, it does not need to consider whether Plaintiff established the second prong or whether Defendants established the third prong. *Indag GmbH & Co. v. IMA S.P.A*, 150 F. Supp. 3d 946, 967 n. 8 (N.D. Ill. 2015).

the lack of personal jurisdiction is clear, jurisdictional discovery would serve no purpose and should not be permitted. *Sanderson v. Spectrum Labs, Inc.*, 248 F.3d 1159 (Table), 2000 WL 1909678, *3 (7th Cir. 2000) (citations omitted).

With respect to specific jurisdiction,[6] there is no basis in the record to suspect that discovery would identify any other relevant contacts between Defendants and Illinois. Given that it was a defendant in the underlying out-of-state lawsuits, Plaintiff presumably was aware of all Defendants' contacts with Illinois in relation to those lawsuits and has already alleged those contacts in its Complaint. Accordingly, no discovery is needed with regard to specific jurisdiction.

With respect to discovery regarding general jurisdiction, Plaintiff has not made even a colorable showing that Defendants are subject to general jurisdiction in Illinois. Plaintiff has not argued for general jurisdiction,[7] and Plaintiff's allegations and briefing demonstrate that general jurisdiction does not exist. As the Supreme Court has made clear, to "approve the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business . . . is unacceptably grasping." *Daimler*, 134 S. Ct. at 757 (citations and quotations omitted). Here, the Defendant Firm has a principal place of business in Texas and is incorporated in Texas, the firm owns no property in Illinois and retains no records here, none of the Firm's lawyers are licensed in Illinois, and the individual defendants do not reside in Illinois. Plaintiff argues that the Defendant Firm has filed "44 cases in Illinois courts," but just because Defendants' national practice occasionally causes it to litigate cases in Illinois does not mean that Defendants' contacts with Illinois are "so continuous and systematic as to

---

[6] Although not entirely clear in its brief, Plaintiff's request for discovery appears to focus on general jurisdiction not specific jurisdiction. The Court nevertheless addresses specific jurisdiction.
[7] Plaintiff admits that it has not "ask[ed] the Court to find that it has general jurisdiction over Defendants." (R. 34, Pl.'s Opp'n to Defs.' Mot. to Dismiss at 19.)

render [it] essentially at home" in Illinois. *Id*. at 761, 762 ("A corporation that operates in many places can scarcely be deemed at home in all of them."); *see also Meyer*, 2012 WL 1050296, at *2 (finding New Jersey firm was not subject to general jurisdiction in Illinois because firm did not have Illinois offices or residents and firm's litigation activity in Illinois was a small part of its practice). Plaintiff has thus failed to make a *prima facie* case for general jurisdiction, and jurisdictional discovery is inappropriate. *Central States*, 230 F.3d at 946; *see also RGT Holdings, Inc. on behalf of Ticket Reserve, Inc. v. Harmon*, No. 16-CV-05457, 2017 WL 959020, at *4 (N.D. Ill. Mar. 13, 2017) ("Without such a *prima facie* case, discovery would only harass the defendants and force the Court to preside over discovery in a case over which it lacks jurisdiction.")

In addition, in Plaintiff's one sentence request for discovery, it does not articulate what discovery it seeks, why such discovery is necessary, or how such discovery could advance its arguments. Plaintiff has failed to meet its burden regarding discovery. As such, the Court denies Plaintiff's request for jurisdictional discovery.

### E. Venue

Even if the Court had concluded that Plaintiff satisfied its burden to make a prima facie showing of personal jurisdiction, the Court would still dismiss this case for improper venue.

"The plaintiff bears the burden of demonstrating that the venue it has chosen is proper." *Harris v. comScore, Inc.,* No. 11 C 5807, 2011 WL 4738357, *1 (N.D. Ill. Oct.7, 2011). Neither party argues that the RICO venue provision, 18 U.S.C. § 1965(a), applies here, so the general venue statute governs. Venue is proper "in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). The test for a determination of proper venue under Section 1391(b)(2) "is not whether a majority of the

activities pertaining to the case were performed in a particular district, but whether a substantial portion of the activities giving rise to the claim occurred in a particular district." *See Jackson v. N'Genuity Enters., Co.,* No. 14 C 2197, 2014 WL 4269448, at *6–7 (N.D. Ill. Aug. 28, 2014). "The test for venue under § 1391 looks not to the defendant's contacts with the forum, but the location of the events giving rise to the cause of action. *Master Tech Prod., Inc. v. Smith*, 181 F. Supp. 2d 910, 914 (N.D. Ill. 2002). Courts in this district generally hold that the locus of a plaintiff's economic harm is an insufficient basis for venue under § 1391(b)(2). *Bartlett v. Bartlett*, No. 16 CV 6595, 2017 WL 106043, at *3 (N.D. Ill. Jan. 11, 2017).

Here, Plaintiff has not demonstrated that venue in this district is proper. Assuming Plaintiff's allegations as true, a substantial portion of the activities giving rise to Plaintiff's claim did not occur in this district. The only activities giving rise to the claim that occurred in this district were Plaintiff's receipt of discovery responses and communications with Defendants about the litigation. All the other activities giving rise to Plaintiff's claim—the drafting of Defendants' discovery responses, Defendants' clients' depositions, Defendants' clients' in-court testimony, Defendants' interactions with and counseling of their clients, Defendants' filing of lawsuits, trials resulting in verdicts against Plaintiff, Defendants' in-court false assertions, Defendants' alleged collaboration with other law firms—occurred in other districts. Here, even though there were some activities giving rise to this claim that occurred in this district, those activities were "more tangential than substantial," and are in insignificant when compared to the consistent and substantial activities that occurred in other districts. *Circle Grp. Internet, Inc. v. Atlas, Pearlman, Trop & Borkson, P.A.,* No. 01 C 7338, 2002 WL 1559637, at *3 (N.D. Ill. July 16, 2002) (finding venue improper in this District because the meetings and telephone, fax, mail and email communications between the Illinois plaintiff and the defendants were "more

tangential than substantial and are thus insufficient to establish venue here").  As such, venue in this District is not proper.

**CONCLUSION**

For these reasons, the Court grants Defendants' motion to dismiss for lack of personal jurisdiction without prejudice to refile in a district that has personal jurisdiction over Defendants.


**Dated:** March 23, 2017


**ENTERED**


_____
**AMY J. ST. EVE**
**United States District Court Judge**
